**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| HEATHER TURREY, OLIVER FIATY; JORDAN HERNANDEZ; JEFFREY SAZON, individually and on behalf of all others similarly situated, | Nos. 24-3849, 25-2135, 25-2137, 25-3454 |
| *Plaintiffs - Appellees*, | D.C. No. 3:20-cv-00697-DMS-AHG |
| v. | |
| VERVENT, INC., ACTIVATE FINANCIAL, LLC; DAVID JOHNSON, | OPINION |
| *Defendants - Appellants*. | |

Appeal from the United States District Court
for the Southern District of California
Dana M. Sabraw, District Judge, Presiding

Argued and Submitted May 18, 2026
Pasadena, California

Filed August 12, 2026

Before: Mark J. Bennett, Lucy H. Koh, and Salvador
Mendoza, Jr., Circuit Judges.

Opinion by Judge Mendoza

# SUMMARY[*]

## Civil RICO / Statute of Limitations

The panel affirmed the district court's judgment after a jury trial in favor of the plaintiffs in an action under the Racketeer Influenced and Corrupt Organizations Act against student loan servicers.

The panel held that there was sufficient evidence for the jury to find that the plaintiff borrowers, students of ITT Technical Institute, a for-profit college, neither knew, nor reasonably should have known, of their fraud-based injuries more than four years before they filed suit in April 2020. The initiation of their lawsuit therefore fell squarely within RICO's four-year statute of limitations.

The panel further concluded that the defendants failed to preserve a proximate causation challenge for appellate review because the district court's denial of summary judgment on this ground turned on disputed factual issues, and defendants never renewed the challenge at the end of trial.

## COUNSEL

Timothy G. Blood (argued), James M. Davis, and Leslie E. Hurst, Blood Hurst & O'Reardon LLP, San Diego, California; John J. Grogan, Irv Ackelsberg, and David A.

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

Nagdeman, Langer Grogan & Diver PC, Philadelphia, Pennsylvania; for Plaintiffs-Appellees.

Aileen M. McGrath (argued) and Joel F. Wacks, Morrison & Foerster LLP, San Francisco, California; Joseph R. Palmore, Morrison & Foerster LLP, Washington, D.C.; Matthew H. Ladner, Troutman Pepper Locke LLP, Los Angeles, California;

John S. Purcell and Douglas E. Hewlett Jr., ArentFox Schiff LLP, Los Angeles, California; for Defendants-Appellants.

**OPINION**

MENDOZA, JR., Circuit Judge:

This case asks us to decide a twelve-million-dollar question: *What did the student borrowers know, and when did they know it?*

Following a two-week-long trial, a Southern California jury found that a group of student borrowers were victims of an elaborate scheme that left them making hefty payments on fraudulent student loans. Now, on appeal, the student loan servicer Defendants contend that Plaintiffs waited too long to file their lawsuit. Central to this dispute is the principle that the law is patient to afford parties time to seek relief after their injuries, but even the law's forbearance expires. That understanding is reflected in the four-year statute of limitations for bringing civil lawsuits under the Racketeer Influenced and Corrupt Organizations ("RICO") Act. So, the question in this appeal is when Plaintiffs knew,

or reasonably should have known, enough about their alleged injury to timely file their civil RICO claim.

We hold that there was sufficient evidence for the jury to find that Plaintiffs neither knew, nor should have known, of their fraud-based injuries more than four years before they ultimately filed suit in April 2020. The initiation of Plaintiffs' lawsuit therefore fell squarely within RICO's four-year statute of limitations. We further conclude that Defendants failed to preserve their proximate causation challenge for appellate review. We affirm.

## I. BACKGROUND & HISTORY

### A. Factual Background

Before the 2008 financial crisis, for-profit colleges were on the rise in the United States. Among the largest at the time was ITT Educational Services, Inc. ("ITT"), a publicly traded company that operated campuses nationwide and enrolled tens of thousands of students into ITT Technical Institute.

Like many of its peers, ITT depended heavily on federal student-aid dollars to keep its doors open. The federal government had historically provided for-profit colleges with substantial funding in order to continue their operations. But in 1998, Congress imposed a limit on these schools' ability to access federal funding. Under the so-called "90/10 Rule," no more than ninety percent of a for-profit school's revenue could come from certain federal government programs. That meant that the remaining ten percent was required to come from non-federal sources, such as private entities. The 90/10 Rule reflected the idea that, if a school's programs provided genuine value, someone other than the federal government should be willing to pitch in.

After the 2008 financial crisis, many for-profit educational institutions' funding sources collapsed. The 90/10 Rule became difficult to satisfy following the market crash because private lenders that had previously financed student loans to for-profit schools largely abandoned the market. But ITT still needed to secure at least ten percent of its funding from non-federal sources. So, it responded to the crash by *quietly* creating its own source of financing to create the false impression that it was complying with the 90/10 Rule. In 2010, ITT, with the backing of Deutsche Bank, established a private student loan program known as "PEAKS." The PEAKS program was structured through a trust fund that sold securities to investors and then used the proceeds of those transactions to produce loans to students enrolled in ITT Technical Institute. Over time, the program issued a staggering 55,000 loans, collectively valued at roughly $300 million.

This arrangement was intended to solve two problems at once. First, as discussed, the PEAKS program generated the non-federal revenue that ITT needed to maintain compliance with the 90/10 Rule and access to federal funding. And second, the arrangement provided students with access to loans that had become increasingly difficult to obtain from outside sources after the collapse of the private lending market.

But there was a not-so-small catch. The loans, which appeared to be externally supported by outside investors, were *actually* internally backed by substantial guarantees from ITT itself. Investors agreed to purchase securities supporting the program because ITT privately assumed responsibility for significant losses if borrowers failed to repay their loans. As defaults increased, so too did ITT's financial exposure.

As the PEAKS program continued its operations, ITT's student loan servicing responsibilities were eventually assigned to First Associates Loan Servicing LLC, a company later known as Vervent, Inc. ("Vervent"). Starting at the end of 2011, Vervent maintained borrower accounts, processed payments, communicated with borrowers, reported information to credit bureaus, and actively administered collection efforts when borrowers became delinquent.

For thousands of students, the arrangement appeared straightforward. They enrolled at ITT to receive an education, borrowed funds through the PEAKS program to finance that education, and made payments through Vervent after entering the repayment process. The program did have a few oddities, including loan terms that seemed to omit certain details. Some missing terms of the loan applications and agreements included the amount of the loan, the interest rate, the payment plan, and the associated fees. But many of the documents explained those omissions by noting that the missing terms would eventually be disclosed in an "approval disclosure statement." So, many students continued to routinely make payments on the loans without any suspicion that something was wrong.

But the program began to falter. By late 2011, PEAKS loans were performing far worse financially than anticipated. Student borrowers defaulted on their loans at exceptionally high rates, causing ITT's guarantee obligations to increase dramatically. ITT faced mounting liabilities that threatened its financial condition.

Rather than disclosing the full extent of those obligations to the PEAKS program, ITT undertook a series of measures designed to conceal from its investors, and the government, the program's deteriorating condition. One practice

involved covertly making payments on behalf of delinquent borrowers, which delayed defaults and postponed the triggering of additional guarantee obligations.

These payments concealed tens of millions of dollars in anticipated liabilities and created the impression that the PEAKS portfolio was performing significantly better than it actually was.  ITT understated the magnitude of future PEAKS obligations, failed to accurately account for aspects of the program in its financial statements, and withheld important information from investors and auditors concerning the program's dire condition.

By early 2014, these problems started to attract regulatory attention.  The Consumer Financial Protection Bureau ("CFPB") filed a civil action against ITT alleging that the PEAKS program was "ostensibly run by third parties" but was "in reality controlled by ITT and backed by an ITT guarantee that protected those third parties from loss."  And, in May 2015, the Securities and Exchange Commission ("SEC") filed a civil enforcement action alleging that ITT and senior executives had concealed the extraordinary failure of the PEAKS program and misled investors about the resulting financial consequences.  Both the CFPB and SEC actions against ITT eventually settled.  But Vervent was not a part of those actions and continued to enforce and collect on the PEAKS loans.

In 2016, ITT collapsed.  Facing mounting pressure from multiple new government investigations and overwhelming financial instability, the company ceased operations on September 6, 2016, and filed for Chapter 7 bankruptcy on September 16, 2016.  The negative publicity was

widespread.[1]   Campuses spontaneously closed across the country, leaving thousands of students stranded and abruptly ending one of the largest for-profit educational enterprises in the nation.

But the downfall of ITT did not immediately extinguish the PEAKS loans.  Those loans remained active and serviced through Vervent until the PEAKS loans were cancelled as a result of other litigation.  A lawsuit against Vervent and its leaders for their role in this scheme followed.

## B. Procedural History

On April 10, 2020, three former ITT students filed this putative class action lawsuit in the Southern District of California against Vervent, Vervent's subsidiary Activate Financial, LLC ("Activate Financial"), CEO and owner David Johnson, Vice President of Sales Christopher Shuler, and Executive Vice President and owner Laurence Chiavaro.[2]   Plaintiffs alleged that Vervent and its co-Defendants participated in a broader enterprise involving the

---

[1] Patricia Cohen, *Downfall of ITT Technical Institutes Was a Long Time in the Making*, N.Y. TIMES (Sept. 7, 2016), https://www.nytimes.com/2016/09/08/business/downfall-of-itt-technical-institutes-was-a-long-time-in-the-making.html; [https://perma.cc/WC2T-7D3P]; Melissa Korn, *ITT Technical Institute Shuts Down After Government Cut Off New Funding*, WALL ST. J. (Sept. 6, 2016, at 21:08 ET), https://www.wsj.com/articles/itt-technical-institute-to-close-after-government-cuts-off-new-funding-1473163181; [https://perma.cc/X67B-5H6F]; Lauren Camera, *ITT Tech Closes Its Doors*, U.S. NEWS & WORLD R. (Sept. 6, 2016, at 10:45 ET), https://www.usnews.com/news/articles/2016-09-06/itt-tech-closes-its-doors; [https://perma.cc/MHX8-BGBC].

[2] The court compelled arbitration of Plaintiffs' claims against Deutsche Bank, and Plaintiffs subsequently dismissed their case as to that defendant.

PEAKS student loan program and asserted claims under RICO, 18 U.S.C. § 1962(d), as well as various state-law and consumer-protection theories. Plaintiffs alleged that the PEAKS program was designed to generate non-federal revenue for ITT in order to preserve ITT's facial compliance with the 90/10 Rule, and that Defendants knowingly serviced and collected on loans arising from that scheme.

The litigation proceeded through extensive discovery, motion practice, expert discovery, and class-certification proceedings. It also resulted in the reduction and replacement of various named plaintiffs at different points. Relevant here, Defendants argued at summary judgment that Plaintiffs' RICO claims were barred by the four-year statute of limitations because their payments and publicly available information concerning the PEAKS program alerted Plaintiffs to their potential claims by at least 2014, well over four years before their suit was filed in April 2020. Defendants also asserted that Plaintiffs could not satisfy RICO's proximate cause requirement by contending that they could not show that the claimed "injury *stemm[ed] from* the alleged wrongful conduct."

The district court denied Defendants' summary judgment motions relating to timeliness and proximate causation. As to timeliness, the court concluded that Plaintiffs either discovered their injuries in October 2020 upon notice of their loan balances being cancelled, or in September 2016, once ITT filed bankruptcy. As to proximate causation, the district court determined that factual disputes barred judgment as a matter of law regarding the relationship between Defendants' alleged conduct and Plaintiffs' loan payment injuries.

The case proceeded to a jury trial in June 2023.  Over the course of two weeks, the jury heard testimony from former students, loan-servicing personnel, expert witnesses, and other participants connected to the PEAKS program.  The evidence addressed the questionable structure of the PEAKS program, ITT's financial incentives, the role of Vervent and related entities in concealing the true nature of the PEAKS program and in servicing the loans, the government's investigations into ITT, the continued collection of PEAKS loans after ITT's collapse, and the extent to which borrowers reasonably understood the nature of the alleged scheme before 2016.

At the close of Plaintiffs' case, Defendants moved for judgment as a matter of law under Federal Rule of Civil Procedure 50(a).  Defendants argued that Plaintiffs' claims were time-barred by RICO's four-year statute of limitations and that each attempt to collect on the loans did not restart the clock.  The district court denied Defendants' Rule 50(a) motion.

The jury subsequently returned a verdict in Plaintiffs' favor on their RICO claims against Vervent, Activate Financial, and David Johnson.  Among other findings, the jury determined that Defendants participated in a RICO enterprise and conspiracy and awarded four million dollars in damages arising from payments Plaintiffs made on PEAKS loans between April 10, 2016, and September 2020.  That amount was trebled under RICO for a total damages award of twelve million dollars.  The verdict necessarily reflected the jury's determination that Plaintiffs suffered cognizable injury during the period contained within the four-year statute of limitations and that Defendants' participatory conduct proximately caused those injuries.  Indeed, the verdict form asked, "[d]o you find that this

alleged conspiracy caused economic injury to Plaintiffs and the class members?"  The form indicates that the jury answered "YES" as to Vervent, Activate Financial, and David Johnson.

Following the jury's verdict, Defendants renewed their request for judgment as a matter of law under Rule 50(b). This time, Defendants argued that Plaintiffs' claims were untimely because the statute of limitations should have started running when their loans were issued in 2010 and 2011 or, at the latest, when they began to make payments on those loans in 2012 and 2013.  Defendants also reiterated their contention that each attempt at collection on the student loans did not delay the running of the statute of limitations.

The district court denied the Rule 50(b) motion.  The court concluded that the RICO claim was timely because the record contained "evidence that there were efforts by ITT and Defendants to ensure that Plaintiffs would not learn about the fraudulent nature of the loans."  The district court thereafter entered judgment in Plaintiffs' favor and later awarded attorney's fees under RICO.  Defendants timely appealed.

## II. STANDARD OF REVIEW

The denial of motions for judgment as a matter of law is reviewed de novo.  *Castro v. County of Los Angeles*, 833 F.3d 1060, 1066 (9th Cir. 2016) (en banc).  Judgment as a matter of law is proper "if the evidence, construed in the light most favorable to the nonmoving party, permits only one reasonable conclusion, and that conclusion is contrary to the jury's verdict."  *Id*. (citation omitted).  We may not reweigh the evidence or make our own credibility determinations. *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 150 (2000).  The district court's orders denying Vervent's

motions for summary judgment are also reviewed de novo. *See Rezner v. Bayerische Hypo-Und Vereinsbank AG*, 630 F.3d 866, 871 (9th Cir. 2010).   Summary judgment is appropriate if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).

### III. ANALYSIS

This appeal presents two issues.  We must first determine whether Plaintiffs knew, or reasonably should have known, of their injuries by April 10, 2016, such that their claims are time-barred by RICO's four-year statute of limitations. Then, we must decide whether Defendants adequately preserved their challenge to proximate causation following a full jury trial.

We conclude that the jury had enough evidence to find that Plaintiffs neither knew, nor reasonably should have known, of their injuries before April 10, 2016.   Their complaint was therefore timely.  Defendants also failed to preserve their proximate causation challenge because the district court's summary judgment ruling turned on disputed factual issues and Defendants never renewed that challenge at the end of trial.  We therefore affirm.

### A. RICO's Four-Year Statute of Limitations

Statutes of limitations reflect the idea that the law gives injured parties only a certain amount of time to seek relief. In practical terms, they function a bit like a countdown clock. Once the clock starts ticking, a plaintiff has a finite period of time to bring a lawsuit.  When the clock runs out, so too does a plaintiff's right to sue.

In this case, the difficult question is not how long the clock runs.  There is no dispute that civil RICO claims are

governed by a four-year statute of limitations. *See Agency Holding Corp. v. Malley-Duff & Assocs., Inc.*, 483 U.S. 143, 156 (1987). Instead, the question that lies at the heart of this appeal is *when* the clock started ticking in the first place.

Let's begin with what we have said on this point. This court has long applied what is known as the "injury discovery" rule. *See Grimmett v. Brown*, 75 F.3d 506, 511 (9th Cir. 1996) ("[W]e have faithfully followed the 'injury discovery' rule for over a decade."). Under that framework, the four-year "clock" begins to run for a civil RICO claim when the plaintiff "knew or should have known of his injury." *Rotella v. Wood*, 528 U.S. 549, 553–54 (2000).

Supreme Court precedent also guides our review. It has approved of the "injury discovery" rule, but declined to adopt a version of that rule that delays accrual of the statute of limitations until a plaintiff discovers the *entire* "pattern" of racketeering activity. *Id*. at 555 ("A pattern discovery rule would allow proof of a defendant's acts even more remote from time of trial and, hence, litigation even more at odds with the basic policies of all limitations provisions: repose, elimination of stale claims, and certainty about a plaintiff's opportunity for recovery and a defendant's potential liabilities.").

But when, exactly, *does* an injury become discoverable? Sometimes, an injury *itself* may be concealed by fraud such that it is not easily identifiable. So does the clock start ticking on the statute of limitations when the injury first happens, or when a plaintiff discovers (or should have discovered) the fraudulent nature of that injury?

We have long adopted the latter approach. Where fraud masks the injury, accrual does not begin until the plaintiff knew, or reasonably should have known, of the fraud-

induced nature of the injury. *See Living Designs, Inc. v. E.I. Dupont de Nemours & Co.*, 431 F.3d 353, 365 (9th Cir. 2005) ("Plaintiffs' RICO claims accrued when Plaintiffs had actual or constructive knowledge of [the] fraud."); *Beneficial Standard Life Ins. Co. v. Madariaga*, 851 F.2d 271, 275 (9th Cir. 1988) ("The plaintiff is deemed to have had constructive knowledge if it had enough information to warrant an investigation which, if reasonably diligent, would have led to discovery of the fraud.").

So, when did Plaintiffs in this case become aware of the fraud underlying their student loan payments?  Defendants contend that Plaintiffs knew, or should have known, of their alleged injury the *moment* they began making payments on the PEAKS loan or when the government *initiated* various regulatory investigations into the PEAKS program.**[3]**  On the other hand, Plaintiffs contend that they neither knew, nor should have known, of their injury until the high-profile bankruptcy and collapse of ITT in September 2016.  We conclude that sufficient evidence presented at trial shows that Plaintiffs were reasonably not aware of the fraudulent nature of their loan payment injuries until *after* ITT's high-profile collapse in September 2016.  As such, a reasonable jury could have found that Plaintiffs were not on inquiry notice more than four years before April 10, 2020, the day they filed suit.

Let's start with the basics.  We know that Plaintiffs were certainly not placed on inquiry notice merely because they experienced an otherwise ordinary financial transaction. Millions of Americans regularly make student loan

---

[3] Defendants preserved the statute of limitations issue by raising it in their Rule 50(a) and Rule 50(b) motions. *See EEOC v. Go Daddy Software, Inc.*, 581 F.3d 951, 961 (9th Cir. 2009).

payments without experiencing any legal injury. So, the injury discovery rule must demand something more.

That "something more" is the *fraudulent* nature of Plaintiffs' injury. What makes their payments an "injury" is the fact that the risk-laden support for the PEAKS loan program was deliberately concealed from the government and student borrowers alike. In other words, the injury was the payment on loans that were generated and maintained through *concealment* and *fraud*. The relevant inquiry is thus not when Plaintiffs knew they were making payments, but when Plaintiffs knew or reasonably should have known that those payments were fraudulently induced. *See Living Designs*, 431 F.3d at 365; *Beneficial Standard Life*, 851 F.2d at 275.

Defendants tell us it is not that simple. They suggest that the Supreme Court in *Rotella* rejected a rule that would have delayed accrual until a plaintiff discovered the full RICO enterprise. *See* 528 U.S. at 557–59. We agree.

But *Rotella* did not go as far as holding that benign acts taken without awareness of the underlying fraud may "start the clock" on a statute of limitations. Nor is it inconsistent with our subsequent recognition in *Living Designs* that, in concealed-fraud cases, discovery of the fraud and discovery of the injury may coincide. 431 F.3d at 365.

Defendants argue that even if the statute of limitations only began to run at the time when Plaintiffs knew or should have known of the fraud, reversal is still required. Defendants contend that Plaintiffs were on inquiry notice by at least 2015 because of two categories of evidence: (1) public investigations into ITT and the PEAKS program; and (2) irregularities in the loan documents themselves. We

conclude that neither argument compels reversal under the demanding Rule 50 standard.

First, we reject Defendants' assertion that the alleged loan documentation irregularities should have put student borrowers on inquiry notice as to the fraud. Defendants point to incomplete terms, missing documents, and other abnormalities that they assert should have prompted borrowers to investigate further and discover the fraud. But the jury heard testimony quite to the contrary. Defendants' *own* expert witness testified that the program appeared to be "a legitimate, functioning program" from a loan-servicing perspective. He further explained that third-party payments on delinquent accounts, while "unusual," were "not uncommon" in the student loan industry. The jury also heard testimony that when one borrower inquired about third-party payments on the borrower's account, Defendants falsely told the borrower that they qualified for a "recovery program." On this testimony, a reasonable juror could infer that ordinary student loan borrowers would be *even less* equipped than sophisticated servicing professionals to detect an underlying fraudulent scheme.

Second, the jury reasonably could have concluded that the various complex government investigations before 2016 did not place borrowers on notice that their own payment obligations had been fraudulently induced. Defendants rely on the SEC and CFPB investigations into ITT's financial practices to argue that Plaintiffs reasonably should have been aware of the fraud prior to 2016. But the evidence showed that those investigations focused primarily on the accounting practices, financial disclosures, and balance-sheet management of ITT, not on wrongdoing by Vervent as the loan servicer. Defendants' *own* expert acknowledged that the investigations did not appear to allege "improper or

inappropriate activities" by Vervent.  Vervent's CEO similarly testified that the SEC's lawsuit concerned "really arcane accounting rules . . . , which I don't pretend to understand."  If these regulatory investigations did not tip off a sophisticated corporation, it is difficult to conclude that ordinary student borrowers should have been better detectives.  Complex regulatory investigations will rarely put unsuspecting consumers on notice of fraud for the purpose of starting the clock on the statute of limitations.

Our reasoning illustrates an important point: inquiry notice depends heavily on context.  A sophisticated financial institution reviewing regulatory investigations may reasonably be expected to appreciate implications that would not be obvious to ordinary consumers.  But student borrowers are not held to the same level of financial sophistication as institutional investors, specialized corporations, or industry insiders.  Indeed, our precedent rejects an "injury discovery" rule that would assess inquiry notice in a vacuum.  The question is what a *similarly situated* plaintiff would have understood under the circumstances. *See, e.g.*, *Mathews v. Kidder, Peabody & Co.*, 260 F.3d 239, 251 (3d Cir. 2001)  ("[A] plaintiff is on inquiry notice whenever circumstances exist that would lead a *reasonable investor of ordinary intelligence*, through the exercise of reasonable due diligence, to discover his or her injury." (emphasis added)).

That's what makes Defendants' position so ironic here. At trial, Defendants presented testimony emphasizing that even Vervent, a sophisticated loan-servicing entity operating within the industry itself, did not recognize the PEAKS program as fraudulent during the relevant period.  Yet, on appeal, Defendants now contend that ordinary student borrowers necessarily should have dropped their notebooks

and discovered the fraud years earlier based on complex regulatory filings and irregular loan paperwork that Vervent itself argued were seemingly benign. The jury could reasonably have concluded that ordinary student borrowers would not infer from complex regulatory investigations or abnormal paperwork that their own loan obligations had been fraudulently induced through a concealed RICO enterprise. These borrowers understandably trusted their school and loan servicer, and were injured as a result.

The evidence supports the conclusion that ITT's headline-grabbing dramatic collapse and bankruptcy in September 2016 represented the first moment when reasonable borrowers would likely have understood that something was awry with the PEAKS program. Until that point, borrowers continued making payments on what outwardly appeared to be ordinary student loans serviced through conventional channels. Only *after* ITT's collapse did the broader structure of the PEAKS program and the extent of the alleged concealment become publicly visible such that ordinary student loan borrowers would have been aware.

Ultimately, Defendants ask us to hold that student borrowers were required to infer hidden fraud from routine payment obligations, complicated regulatory investigations, and irregular paperwork long before ITT's collapse exposed the PEAKS program to broader public scrutiny. Even if some jurors could have been persuaded by Defendants' position, that is not the standard by which we must review the district court's denial of Defendants' motion for judgment as a matter of law. Under Rule 50, the question is whether the evidence permits *only one* reasonable conclusion contrary to the jury's verdict. *See Castro*, 833 F.3d at 1066. Here, it does not.

Substantial evidence supports the jury's determination that Plaintiffs neither knew, nor reasonably should have known, of their alleged injury more than four years before filing suit.  Defendants' statute-of-limitations challenge fails, and we affirm the district court's denial of Defendants' renewed motion for judgment as a matter of law.[4]

## B. The Proximate Cause Issue

Defendants next argue that the district court erred by denying summary judgment as to the issue of proximate causation.  Defendants contend that Plaintiffs' injuries were too remote because the alleged fraud was directed primarily toward regulators and investors rather than toward the student borrowers themselves.  But we need not reach the merits of that argument, as Defendants failed to preserve the issue for appellate review in the posture presented here.

Ordinarily, a district court's denial of summary judgment is not reviewable after a full trial on the merits. *See Ortiz v. Jordan*, 562 U.S. 180, 188 (2011).  And this makes sense.  That rule exists because the trial record supersedes the prior summary judgment record, and factual disputes resolved by a jury cannot ordinarily be revisited through appellate review of an earlier summary judgment ruling. *Id.* at 184.

The Supreme Court recently clarified that this rule is not absolute.  Although denials of summary judgment generally become unreviewable after a full trial on the merits, an exception exists for issues that are purely legal in nature. Such issues remain reviewable on appeal because their

---

[4] Because we affirm on this basis, we need not reach Plaintiffs' alternative argument that their RICO claims were timely under the "separate accrual" rule. *See Grimmett*, 75 F.3d at 510–11.

resolution does not depend on any evidentiary issues developed at trial.  *See Dupree v. Younger*, 598 U.S. 729, 735 (2023) ("Trials wholly supplant pretrial factual rulings, but they leave pretrial legal rulings undisturbed.  The point of a trial, after all, is not to hash out the law.").

This case does not fit within *Dupree*'s narrow exception. Contrary to Defendants' assertion, the district court did not adopt a categorical legal rule on proximate causation that favored Plaintiffs. [5]   Instead, without reaching a clear judgment on the correct legal standard for proximate cause, the district court concluded that genuine disputes of material fact precluded judgment as a matter of law.  In denying summary judgment, the district court explained that "[h]ad the loans not been made . . . and had Defendants not assisted in servicing them, [the named Plaintiff] would not have made loan payments to Defendants," and that this evidence was "enough at this stage to create a genuine factual issue as to the nexus between [the named] Plaintiff's injury and Defendants' conduct."

Like many (but not all) denials of summary judgment, the district court's ruling fundamentally turned on disputed *factual* issues.  The court determined that a reasonable jury could find that Defendants' alleged servicing and collection activities were sufficiently related to Plaintiffs' injuries. Resolving that issue required evaluating competing factual narratives concerning the nature of the PEAKS program, the targets of the alleged scheme, the role of Vervent, and the mechanism by which Plaintiffs' injuries occurred.  Those are

---

[5] Had the district court adopted a clear legal rule as to proximate causation at summary judgment, that issue would have been reviewable. But here it only concluded that material issues of fact existed as to whether Plaintiffs established proximate causation.

not purely legal determinations detached from the evidentiary record, but quintessential questions for the jury. *See Ortiz*, 562 U.S. at 190.

Equally important, Defendants failed to preserve a post-trial sufficiency challenge directed at the proximate cause theory they now advance on appeal. *See Go Daddy Software*, 581 F.3d at 961 (noting that post-trial sufficiency review is limited to grounds specifically raised in Rule 50(a) motions). Nor did Defendants object to the district court's causation instructions, which largely mirrored Defendants' *own* proposed language.

In short, Defendants seek appellate review of a summary judgment ruling that turned on disputed factual issues after a full jury trial and without a properly preserved Rule 50 challenge to the specific theory they now emphasize on appeal. *Ortiz* forbids that approach. We therefore decline to reach the merits of Defendants' proximate causation arguments and affirm the district court on this ground as well.

## IV. CONCLUSION

Fraud rarely announces itself. For years, Plaintiffs made routine payments on loans that appeared legitimate and which were serviced through seemingly ordinary channels by sophisticated financial entities. These student borrowers trusted those organizations. It was only *after* ITT's dramatic collapse in September 2016, and the unraveling of the PEAKS program, that Plaintiffs understood they may have been duped. The jury heard extensive testimony, considered competing explanations for what the student borrowers and Defendants reasonably should have understood, and ultimately concluded that Plaintiffs neither knew, nor reasonably should have known, of their alleged injury

outside the four-year limitations period. The demanding standard of review does not license us to retry the case from the appellate bench.

This case also serves as an important reminder that statutes of limitations are designed to promote fairness, not gamesmanship. The law requires injured parties to act diligently once wrongdoing becomes reasonably discoverable. But it does not subject ordinary persons to the same standards as sophisticated actors. It also does not require clairvoyance by placing unrealistic obligations on consumers. Simply put, ordinary borrowers are not required to assume that seemingly routine financial obligations conceal a high-level, sophisticated fraudulent scheme involving major institutions, securitized trusts, and complex financial arrangements.

Nor are parties allowed to challenge fact-bound issues on appeal that were never properly preserved after trial. When a party fails to preserve its objections to fact-bound issues through Rule 50 motions following a jury trial, we are typically not free to address those challenges on appeal. Such is the case here.

Because substantial evidence supports the jury's verdict, and because Defendants failed to preserve their proximate causation challenge for appellate review, the judgment of the district court is affirmed.

**AFFIRMED.**